UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) ) ) ) | |
| Plaintiff, ) | Civil Action No. |
| ) | |
| v. ) | JURY TRIAL DEMANDED |
| ) | |
| RAHSAAN KING AND STUDENTS OF STRENGTH, INC., ) ) ) | |
| ) | |
| Defendants. ) ) | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against Rahsaan King ("King") and Students of Strength, Inc. ("Students of Strength" or "the Company") (collectively "Defendants"):

## SUMMARY

1.     This case involves a fraudulent offering of securities by Rahsaan King, the founder and Chief Executive Officer ("CEO") of Students of Strength, Inc. King started Students of Strength in 2013 while a college student, with the stated goal of creating an on-line tutoring company that would use technology to connect college student tutors with disadvantaged student customers. Students of Strength, through King, raised over $1 million from over twenty investors from 2017 to 2018 (the "Relevant Period") through the sale of investment products known as convertible notes and common stock.

2.     Although Students of Strength had very few customers and nominal cash flow, King described the Company to potential investors as a thriving online tutoring business that needed outside investments to grow the business and meet high demand for its services.

3.     To induce people to invest, King misrepresented: 1) Students of Strength's

historical revenue and current cash flow; 2) the Company's assets and liabilities; 3) the Company's operations; and 4) the numbers of tutors hired and students tutored.

4.       By engaging in the conduct alleged herein, Defendants violated various provisions of Section 17(a) of the Securities Act of 1933 (the "Securities Act"); and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder.

5.       Based on these violations, the Commission seeks: (1) entry of a permanent injunction prohibiting Defendants from further violations of the relevant provisions of the federal securities laws; (2) an entry of an injunction requiring Defendants to provide a copy of this Complaint and any final judgment to any prospective investor prior to an investment in Students of Strength or other entities for which King may seek investments; (3) disgorgement of King's ill-gotten gains, plus pre-judgment interest; and (4) the imposition of a civil monetary penalty against King based on the egregious nature of Defendant's violations.

## JURISDICTION AND VENUE

6.       The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §§78u(d)].  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], and Sections 21(d) and (e) and 27 of the Exchange Act [15 U.S.C. §§78u(e) and 78aa].

7.       Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], and Section 27 of the Exchange Act [15 U.S.C. §78aa] because a substantial part of the acts constituting the alleged violations occurred in the District of Massachusetts and because King was, at various pertinent times, resident in Massachusetts, and Students of Strength was headquartered in Massachusetts.

8.       In connection with the conduct alleged in this Complaint, Defendants directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

9.       Defendant's conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

10.       Unless enjoined, Defendants will continue to engage in the securities law violations alleged herein, or in similar conduct that would violate the federal securities laws.

## DEFENDANTS

11.       Rahsaan King, age 25, is a resident of Houston Texas.  During various times during the Relevant Period he was resident in Massachusetts.

12.       Students of Strength was founded as a Massachusetts LLC in or about 2013. Neither Students of Strength nor its securities has ever been registered with the Commission. During the Relevant Period, the Company had offices in Cambridge, Massachusetts and Bryan, Texas.  In January 2018, the company became Students of Strength, Inc., a Delaware corporation.  During the Relevant Period, King was the CEO of Students of Strength.

## FACTUAL ALLEGATIONS

**A.       Background of Students of Strength**

13.       King founded Students of Strength in 2013 with the stated intention of creating an on-line tutoring business.  The Company's informational material emphasized that King had grown up poor in Houston, Texas, and was able to earn a scholarship to an Ivy League college with the help of tutoring.

14.       Students of Strength promoted through its informational materials that the Company's business plan was to utilize technology to facilitate tutoring in order to close the

3

achievement gap between low-income and wealthy students.

15.     The informational materials claimed that Students of Strength had developed an affordable on-line tutoring platform for the purpose of connecting middle and high school students with tutors who were students at top universities.

16.     Students of Strength appears to have sought two types of customers: individual students who sought tutoring (known as "B2C"); and organizations, such as schools, churches or non-profits that signed up groups of students for tutoring (known as "B2B").

17.     By the end of 2017, Students of Strength had a small office in Cambridge, MA, used by King and the Company's head of operations, and a small office in Bryan, TX, purportedly used by sales people.

18.     Prior to the fall of 2017, Students of Strength had no system for tracking income or expenditures.  In or about late 2017, Students of Strength hired a tax preparation and bookkeeping service ("Bookkeeper"), to help maintain basic business records for the company.

19.     King recruited various individuals, some of whom were investors or persons associated with investors, to serve as members of Students of Strength's board of directors. At various times, King received advice and guidance from board members who had legal, accounting, and business experience.  For example, one board member explained to King the meaning of various accounting principles, including terms such as "accounts receivable" and "revenue."  This board member assisted King with drafting balance sheets and income statements, but relied entirely on King to provide accurate information regarding the amounts that were reported as "accounts receivable" owed and "revenue" earned.

20.     Students of Strength had very few paying clients.  When the Company's head of operations began working for the Company in September 2017, she found that the Company had only one B2B customer – a church group in Indiana – and a handful of B2C customers.  Students

of Strength lacked any formal agreements, such as partnerships or contracts, with non-profit organizations or foundations.

21.     During 2015-2017, Students of Strength appears to have had only the following sales: 1) for 2015, $13,000 in possible sales with one payment from a school; 2) for 2016, $13,000 in possible sales, with no B2B customers; and 3) for 2017, $17,000 in possible sales including a payment of $2,500 from a church and $3,990 from a school in the fourth quarter (which appears to have been refunded).

22.     To the extent that Students of Strength may have otherwise provided tutoring services to individuals or businesses, on information and belief, such services were provided without payment to Students of Strength.  At most, Students of Strength served as a meeting place for tutors and students to connect, without any monies paid for the service.

**B.     Misrepresentations When Selling Convertible Notes**

23.     Students of Strength primarily obtained funds for its operations through the sale of investment products known as convertible notes.  Convertible notes are generally a form of short-term debt that can be converted to equity (i.e. an ownership interest) in a company.  For example, through a convertible note an investor might loan money to a start-up company and, instead of a return of the principal plus interest, the investor could opt to receive equity in the company.  The convertible notes offered and sold by Students of Strength were securities.  By the terms of these convertible notes, in exchange for cash paid by investors to Students of Strength, investors received a two-year convertible note with a promise to pay principal and interest upon maturity.  Investors also received the right to convert the amount due into common stock of Students of Strength at a set price, at any time before the maturity date.

24.     When promoting the Company to potential investors during late 2017 and early 2018, King provided revenue projections for Students of Strength showing anticipated revenues

as high as $5 million during 2018.  These projections were described as being based on purported current partnerships with schools and non-profits.  When potential investors asked for specifics relating to the historical performance of the Company, King made misrepresentations about the Company's revenue, its cash flow, the number of signed contracts it had entered into, the number of tutors, and the number of students who had been tutored.

1.   Investor A

25.    For example, in August 2017, Investor A received a Students of Strength investor slide deck describing the purported growth of the Company.  King either drafted the deck himself or provided the information contained within the deck.

26.    One slide in the deck provided to Investor A purported to list the numbers of tutors and clients that the Company had connected.  Specifically, the deck represented that Students of Strength had 300 tutors and 900 clients in 2015, growing to 700 tutors and 1600 clients in 2016.  These figures were grossly misleading.  At best, as to tutors, the numbers in the deck represented the number of individuals who had expressed some interest in tutoring and who were listed in the Company's database.  As to clients, this number did not represent actual paying clients.

27.    In the same deck, another slide represented that Students of Strength had $240,000 in 2015 revenue and $600,000 in 2016 revenue.  These revenue figures were false. King supplied the information for that slide.  Subsequent to receiving the slide deck, Investor A invested $50,000 in a convertible note.

28.    On October 18, 2017, King emailed Investor A indicating that Students of Strength was in urgent need of additional investors.  Among other representations, King claimed that the Company was owed $300,000 in accounts receivable, and that the company needed cash in the short run because customers were not due to pay for 30 days while the Company owed

$40,000 to tutors for that week, and would owe another $40,000 in two weeks.  King wrote that "even though we will be getting paid by our customers by the middle of next month, we cannot afford to ruin our reputation with hundreds of tutors by not paying them on time."  In reality, Students of Strength did not have the cash flow issues described in the email.  Specifically, the Company was not owed $300,000 in accounts receivable.  On the contrary, as noted above, the Company's total revenues from sales during 2017 did not exceed $17,000.  Nor did the Company ever employ tutors whose total compensation approached $40,000 every two weeks.

29.     In December 2017, Investor A invested an additional $25,000 in Students of Strength in the form of a convertible note.

### 2.   Investor B

30.     In March 2018, King solicited an investment from Investor B.  Before investing, Investor B asked King via email on March 28, 2018 for information regarding Students of Strength's current customers and requested "any financials (balance sheet and cash flow)."  In response to Investor B's request, King sent an email dated March 29, 2018 that included a December 2017 Balance Sheet that reflected purported accounts receivable of $128,200, with specific amounts listed as being owed by various purported customers.

31.     King also provided Investor B with minutes from a January 2018 Students of Strength Board meeting at which King represented to the Board that he projected that the Company would have revenues of $300,000 in the first quarter of 2018.

32.     On March 30, 2018, Investor B emailed King asking: "In your Board Minutes you stated a Q1 2018 revenue goal of $300,000.  Given Q1 is at an end, what do you now project for Q1 2018 revenue?"  King responded via email that day "We have met every objective we set forth this quarter."  This representation was false.  At the time of the representations, Students of Strength had about $2,000 of cash flow from sales during the quarter.  Ultimately, the Company

7

determined that its total revenues for the full year 2018 were approximately $18,000.

33.     After these communications, Investor B invested $34,500 in Students of Strength in the form of a convertible note.

### 3.   Foundation Investment

34.     Representing a foundation that was interested in investing in Students of Strength, in April 2018, an advisor asked for information regarding the Company's financial performance. On April 14, 2018, King emailed the advisor a spreadsheet that showed first quarter revenue of $155,000 with details as to amounts purportedly earned from various purported customers, who were identified in the spreadsheet.  The spreadsheet also reflected current accounts receivable of $132,000.  These numbers were false, as they misrepresented the actual revenue of the Company and current accounts receivable of the Company.

35.     The advisor requested detailed information to support the revenue figures that King had provided.  In response, on April 16, 2018, King represented in an email that the Company had "recruited 3600 tutors over the course of the past 2 years," and that the Company "tutors on average 500 hours per day."  King added that "our b2c student base is comprised of 9k students who used the curriculum via the 'home town hero' subscription item and 2k students who subscribed to tutoring where we had about 500 hours of tutoring per day during the school week."  This description of the size and scope of the Students of Strength tutoring operation was grossly misleading.  In actuality, as of 2018, Students of Strength did not have nearly that many tutors involved in tutoring nor did it have nearly that number of students receiving tutoring.

36.     Before recommending that the foundation invest in the Students of Strength, the advisor sought to confirm that the Company had signed contracts to support its optimistic revenue projections.  King first responded that "[o]ur projections depend on current relationships with 4 foundations, 3 corporate sponsors, 12 school partners, and 1 district level opportunity."

37.     The advisor pressed for details in a further email:  "Do you have any signed contracts with any other revenue-source clients?" King responded via email dated April 16, 2018:  "Yes, of course" and listed nine purported clients and categories of clients.  On information and belief, Students of Strength did not have signed contracts promising payment to Students of Strength for services provided with any of the purported clients that King listed.

38.     After these communications, the foundation invested $542,885 with Students of Strength in a convertible note.  The advisor also personally invested $25,000 in a convertible note.

**C.     Misrepresentations in Connection with July 2018 Common Stock Offering**

39.     On July 11, 2018, Students of Strength began an offering of securities.  The offering was designed to raise money by selling common stock in the Company and to reduce the Company's debt by offering note holders an opportunity to convert outstanding convertible notes to common stock.

40.     Of the $165,897 raised by the common stock offering, $125,497 was obtained from one individual, Investor C.  Investor C was an individual whom King had met socially in June 2018.

41.     King made various false and misleading representations to Investor C regarding Students of Strength, describing it as a thriving company with large and complex operations. Among other representations, King represented that: 1)  Students of Strength had an elaborate process for hiring tutors, including using "a customer service team, which we outsource to the Philippines," which was responsible for reviewing videos of potential tutors and providing feedback on their tutoring performance; 2)  Students of Strength hired from 100-300 tutors a month; 3) Students of Strength had "a campus ambassador on each of the top 100 university campuses," who was paid as a contractor to recruit tutors; 4) Students of Strength's tutoring over

that last three years "across 70,000 students" had helped students improve their grades from a D to a B+; and 5) Students of Strength had developed a curriculum for every subject "aligned to the standards of every state" for everything children learn from "two years old to 20 years old."

42.    King's representations to Investor C were false: 1) Students of Strength did not have an elaborate process for hiring tutors; 2) Students of Strength did not hire 100-300 tutors a month; 3) Students of Strength did not have a campus ambassador on 100 university campuses; 4) Students of Strength did not tutor 70,000 students; and 5) Students of Strength did not have a curriculum aligned to the standards of every state.

43.    On July 9, 2018, Investor C emailed King asking if she could delay her investment until August 2018, explaining that she expected to receive dividends worth two thousand dollars from her stock holdings that she intended to liquidate and invest in Students of Strength.  King responded via email that same day: "[i]f you want to wait until August, that is completely up to you. . . .  However, you should know, as of today, the stock is only $3.45 per share.  By August, it will very likely be above $4.00 or higher, so the longer you wait, the less returns you may have in the long run.  Friday is the last date I could guarantee the current price. . . ."

44.    While seeking an investment from Investor C, King was putting together a private placement memorandum (a document typically provided to prospective investors in private offerings of stock which, among other things, describes the company offering the stock, the terms of the offering, and the risks of the investment) in support of the planned offering.  To prepare this private placement memorandum, King sought a draft balance sheet from the Bookkeeper. After receiving the draft balance sheet, King instructed the Bookkeeper via email dated July 10, 20198 to "[a]dd 140k to the cash portion, because I have a deposit coming now and also update account receivables to 236k."  Based on books kept by Students of Strength and on the

information provided by King, the Bookkeeper created a balance sheet which reflected the figures supplied by King.

45.     On July 11, 2018, Investor C received a private placement memorandum with an attached balance sheet for Students of Strength which reflected, among other items, the following false entries: 1) $424,048 in cash and short term investments; 2) $186,000 in accounts receivable; and 3) zero long term debt.  In actuality: 1) the cash and short term investments figure was inflated by $140,000, the amount King had told the Bookkeeper to add; 2) the accounts receivable figure was not supported by the Company's books and records; and 3) the long term debt figure failed to reflect that the Company owed over $1 million to convertible note holders.

46.     The subscription documents to be completed by prospective investors in the offering included an investor questionnaire.  Among other things, the questionnaire included questions about net worth and financial sophistication that, in some circumstances, may be legally required under the federal securities laws.  On July 12, 2018, Investor C returned the questionnaire answering "No" to each of the following questions: 1) I have such knowledge and experience in financial and business matters that I am capable of evaluating the merits and risks of an investment in the Shares of the Company; 2) I can afford the complete loss of the entire amount I may invest in the Share of the Company; and 3) I am able to bear the financial risk of an investment in the Shares of the Company for an indefinite period of time.

47.     King told Investor C that she needed to change each of these answers to "yes," in order to be permitted to invest in the Company.  In response to King's request, Investor C changed the answers and invested $125,407.

**D.     Condition of the Company**

48.     At the end of July 2018, the Company hired a financial advisor to write a report detailing the financial condition of the Company.  This financial advisor found the following:  1)

11

Students of Strength had no meaningful current revenue stream (there were only two B2B active customers who, together, were paying less than $1000 a month, and a nominal number of B2C customers); 2) the Company had identified some potential future B2B customers but had no signed contracts; 3) the Company had poor controls for financial reporting, which made it challenging to produce reliable balance sheets or income statements; and 4) the Company had poor controls for tracking spending, resulting in spending much of the money raised from investors during 2018.

49.     The most promising of the B2B prospects – a third-party reseller that would distribute Students of Strength's services nationwide—in August 2018 concluded that the Company's technology was inadequate and terminated negotiations.  At the same time, none of the other B2B prospects had materialized.

50.     In October 2018, King announced that he was returning to college to finish his degree.  At that point, the Students of Strength formed an executive committee to run the company.  The Executive Committee included King and two board members, an attorney and an accountant.  Ultimately the attorney and accountant became the acting Co-CEOs of Students of Strength.

51.     In January 2019, with the assistance of the financial advisor, the acting Co-CEO's sent a report to the Board of Directors as well as the Company's shareholders and holders of convertible notes.

52.     The report detailed that Students of Strength's 2018 revenue was approximately $18,000 and noted that the Company had provided additional services, including services valued at $52,000, which had been donated to two Houston area schools.  The report also detailed that the Company had incurred $812,000 in year to date expenses, primarily driven by $503,000 of compensation expense as the Company had grown from eight to 22 employees, most of whom

had been hired in preparation for B2B business that never materialized.

53.     Finally, the report disclosed that the Company had cash of $7000 in hand and $1.2 million in debt, primarily consisting of convertible notes, with staggered maturity dates beginning in April of 2019.

54.     In February 2019 the Co-CEOs resigned.

**E.     King's Compensation and Cash Withdrawals**

55.     From 2017-2018, King or his family received about $210,000 in direct payments from Students of Strength.   King also made $53,000 in cash withdrawals from Students of Strength's bank accounts with no record of how the cash was used.  In addition, King used approximately $16,000 of Students of Strength funds on personal expenses such as clothing, food, and international travel including a trip to Europe.

**<u>First Claim for Relief</u>**
**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**

56.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 55 above as if set forth fully herein.

57.     Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail:  (a) have employed or are employing devices, schemes, or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state material facts necessary to make the statements made not misleading; and/or (c) have engaged or are engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons.

58.     By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

<u>**Second Claim for Relief**</u>
**(Violation of Section 17(a)(1) of the Securities Act)**

59.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 55 above as if set forth fully herein.

60.     Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instrumentalities of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities have employed or are employing devices, schemes, or artifices to defraud.

61.     By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. §77q(a)].

<u>**Third Claim for Relief**</u>
**(Violation of Section 17(a)(2) of the Securities Act)**

62.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 55 above as if set forth fully herein.

63.     Defendants, by engaging in the conduct described above in the offer or sale of securities, by use of the means or instrumentalities of transportation or communication in interstate commerce or by the use of the mails, obtained property by means of untrue statements of material fact or omissions to state material facts necessary to make the statements not misleading.

64.     By engaging in the conduct described above, Defendants violated, and unless enjoined will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. §§ 77q(a)(2)].

14

### Fourth Claim for Relief
### (Violation of Section 17(a)(3) of the Securities Act)

65.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 55 above as if set forth fully herein.

66.     Defendants, by engaging in the conduct described above in the offer or sale of securities, by use of the means or instrumentalities of transportation or communication in interstate commerce or by the use of the mails, engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon the purchasers of such securities.

67.     By engaging in the conduct described above, Defendants violated, and unless enjoined will continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(3)].

### PRAYER FOR RELIEF

WHEREFORE,  the Commission  requests that this Court:

A.     Enter a permanent injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission  or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

B.     Enter an injunction requiring Students of Strength for a period of ten years commencing on the date of entry of the final judgment to provide all prospective investors with a copy of the complaint and final judgment in this

action.

C.      Enter an injunction requiring King for a period of ten years commencing on the date of entry of the final judgment to provide all prospective investors in any entity that King directly or indirectly owns or controls, or in any entity by which King is employed or consults with in a capacity that involves offering or selling securities, with a copy of the complaint and final judgment in this action.

D.      Require King to disgorge his ill-gotten gains, plus pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

E.      Require King to pay appropriate civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Securities Exchange Act [15 U.S.C. § 78u(d)(3)];

F.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

G.      Grant such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,


  //s// Martin F. Healey
Martin F. Healey (Mass. Bar No. 227550)
33 Arch Street, 24th Floor
Boston, Massachusetts 02110
Telephone: (617) 573-8952
Facsimile:  (617) 573-4590
Email:  HealeyM@sec.gov

Dated:  April 29, 2021